### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **SONYA YVETTE GARRETT STONE,** | ) | |
| | ) | |
| **Claimant** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.: 1:13-CV-00663-KOB** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **as acting Commissioner of the Social** | ) | |
| **Security Administration**, | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION

### I. INTRODUCTION

On January 27, 2010, the claimant, Sonya Yvette Garrett Stone, applied for a period of disability and disability insurance benefits under Titles II and XVI of the Social Security Act for supplemental security income. (R. 12). She alleges disability commencing on May 23, 2009, because of fibromyalgia, chronic neck and low back pain, headache, and carpal tunnel syndrome (CTS). (R. 15).

The Commissioner denied both claims on April 28, 2010. (R. 92-97). The claimant filed a timely request for a hearing before an Administrative Law Judge on August 12, 2010. (R. 111). The ALJ held a hearing on October 5, 2011. (R. 12). In a decision dated October 21, 2011, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and, thus, ineligible for disability insurance benefits. (R. 27). On March 12, 2013, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1-7). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§

405(g) and 1631(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents two issues for review: (1) whether the ALJ properly applied the pain standard regarding the claimant's testimony of her pain and other symptoms; and (2) whether the ALJ properly discounted the opinion of Dr. Hamo, the claimant's treating physician.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is limited. This court must affirm the Commissioner's decision if she applied the correct legal standards and if substantial evidence supports the factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No...presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must remember that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions, ... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e, that would direct the

determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart,* 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports the finding.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments

set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next
question, or, on steps three and five, to a finding of disability.  A negative answer
to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

In evaluating pain and other subjective complaints, the Commissioner must consider

whether the claimant demonstrated an underlying medical condition, and *either* (1) objective

medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2)

that the objectively determined medical condition is of such a severity that it can reasonably be

expected to give rise to the alleged pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

The ALJ may consider the claimant's daily activities in evaluating and discrediting complaints of

disabling pain. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984).

If the ALJ decides to discredit the claimant's testimony as to her pain, he must

articulate explicit and adequate reasons for that decision; failure to articulate reasons for

discrediting the claimant's testimony requires that the court accept the testimony as true. A

reviewing court will not disturb a clearly articulated credibility finding with supporting

substantial evidence in the record. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995).

Next, the ALJ must state with particularity the weight he assigns to different medical

opinions and his reasons, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d

278, 279 (11th Cir. 1987); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

The ALJ must give the testimony of a treating physician substantial or considerable weight

unless "good cause" is shown to the contrary. *Crawford v. Commissioner*, 363 F.3d 1155, 1159

4

(11th Cir. 2004). The Commissioner may reject any medical opinion if the evidence supports a contrary finding so long as she articulates the reasons. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight and those reasons are supported by substantial evidence, the ALJ commits no reversible error. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

## V. FACTS

The claimant has a high school education and completed fives months of a computer course at Central Alabama Community College. She was thirty-eight years old at the time of the administrative hearing. She previously worked as a cleaner, a fast-food worker, an inspector, a breakfast host, a cashier, and a stocker. (R. 44, 46-48). The claimant alleged that she was disabled by fibromyalgia, chronic neck and lower back pain, neuropathic symptoms of the upper extremity, headaches, and CTS as a result of two motor vehicle accidents on May 23, 2009 and September 12, 2009. (R. 111).

*Physical Limitations*

On May 23, 2009, the claimant arrived at Citizens Baptist Medical Center's Emergency Room with back injuries sustained when a car rear-ended the vehicle in which she was a passenger. X-rays indicated no fracture or mal-alignment, and Dr. David E. Porterfield diagnosed her with a neck strain. (R. 267). However, because of a depicted lucency on the suboptimal odontoid view, the radiologist Dr. Wilton R. Holman III advised the claimant that if the pain persisted, he would recommend a CT for further evaluation. (R. 270). On May 29, 2009, the claimant underwent a lumbar spine MRI that noted narrow signals, a disc desiccation at L3-L4, and bulging discs at L4-L5 and L5-S1 with moderate bilateral foramina scoliosis; a cervical spine

5

MRI that noted cervical spine straightening and prevertebral soft tissue edema suggesting ligamentous injury, but no fractural or natural compromise; and an abdominal/pelvic CT scan that noted no acute intra-abdonimanl abnormality, but did show trace free fluid. (R. 292, 294-95).

On June 9, 2009, the claimant's primary care physician Dr. Laura Deichmann referred her to Dr. Thomas L. Francavilla, a neurological surgeon at the Brain and Spine Center, P.C. Although the May 29, 2009 MRI did not show "any herniations or significant abnormalities," he recommended  lumbar and thoracic MRIs to determine the source of the claimant's pain. (R. 282). On June 11, 2009, neither MRI indicated any abnormalities, although the thoracic MRI noted very mild scoliosis. (R. 292). On June 23, 2009, Dr. Francavilla reported the claimant felt better, still had difficulty sleeping, and had good strength in her arms and legs. Dr. Francavilla discontinued her ER prescriptions for pain and recommended physical therapy. (R. 279).

On July 14, 2009, the claimant visited Coosa Valley Medical Center Rehabilitation Services. The physical therapist Sherry Hornbuckle recommended the claimant use a TENS unit, which uses electric currents to stimulate nerves for therapeutic purposes, two to four times per week. On August 4, 2009, Ms. Hornbuckle discharged the claimant from physical therapy, noting the completion of six visits, and improvements in "flexibility, core strength, postural awareness, and overall body mechanics." (R. 289-90).

On September 12, 2009, the claimant was involved in another motor vehicle accident. She rode in the vehicle that had rolled during the accident.

On November 10, 2009, Dr. Francavilla noted the success of physical therapy prior to her second accident, reporting that she had been pain free. Dr. Francavilla noted the return of back pain, this time "centered at the scapular region bilaterally," radiating from her back to her left leg.

6

Dr. Francavilla noted tenderness in the claimant's spine to palpation in the thoracic area, full range of motion of cervical spine without any guarding, and full range of motion in shoulders. He reviewed her MRI of the lumbar region from November 5, 2009, and found no abnormalities. To rule out thoracic disc pathology, Dr. Francavilla ordered another MRI and recommended physical therapy. (R. 275-76).

On December 16, 2009, a dorsal spine MRI showed no abnormalities. On December 22, 2009, a cervical MRI noted Chiari I malformation, multilevel disc disease, and degenerative change in the claimant. On January 5, 2010, Dr. Francavilla reviewed the MRI results with the claimant and complied with her request for a pain management referral. (R. 274, 285-87).

On January 19, 2010, the claimant consulted with Dr. Thomas Kraus, a pain management specialist at Pain Management Services, P.C. In his physical examination, Dr. Kraus reported that "palpation of the spine reveal[ed] general mild to moderate tenderness." Dr. Kraus also noted a "full range of active and passive motion, with mild to moderate pain and myofascial spasms." He diagnosed her with fibromyalgia, and proscribed an epidural injection that the claimant received on January 26, 2010. (R. 299-304).

On February 3, 2010, the claimant began her treatment with Dr. Wael Hamo, a neurologist at Hamo Neurology Clinic Inc., who performed a motor strength exam, noting "100/100 [for] both upper and lower extremities[;] 80-90/100 [for] opponens muscles, right triceps, and deltoid muscles[;] and 80-90/100 [for] both hip flexors and left anske dorsiflexor, but restricted by pain." Dr. Hamo prescribed Celexa 20mg every day for depression and fatigue, as well as Lortab 10 for severe neck and back pain. He also ordered an MRI of the claimant's lumbosacral spine, an EMG study of her right upper extremity, and an EMG study of her left

lower extremity. He provided specific restrictions, including avoiding repetitive and hard activity of her right upper and left lower extremities; limiting stooping, climbing, and bending; lifting no more than twenty pounds; avoiding sitting for longer than one hour at a time; and avoiding standing for longer than ten minutes at a time. (R. 313-14).

On February 10, 2010, the claimant followed up with Dr. Hamo. The claimant's EMG study from February 3, 2010 revealed moderate right CTS, moderate left CTS, but "[n]o evidence of motor or sensory peripheral neuropathy or mononeuropathy of left lower extremity." The claimant's MRI from February 4, 2010 revealed mild degenerative changes of the lower lumbar spine. Dr. Hamo increased the claimant's Celexa prescription to 40mg per day, and prescribed 750mg of Robaxin for severe neck pain, neck-related headaches, and low back pain; physical therapy of the cervical and lumbosacral spin; TENS unit trial up to eight hours every day as needed; neck and back exercises twice a day; and a wrist splint over her right and left wrist areas. Dr. Hamo did not adjust the claimant's restrictions. The claimant did not wish to proceed with occipital nerve block, sciatic nerve block, trigger point injections, or carpal tunnel injections. (R. 311-12).

On February 22, 2010, the claimant completed a function report for the Social Security Administration. She described her daily activities as waking up, using the restroom, and waking up her sons. She would then prepare breakfast, and ensure that her sons caught the bus by 7:00AM. She would then turn on the television, clean up the kitchen, do some laundry, vacuum if necessary, and then rest for an hour or two. He sons would return around 3:35PM, and her husband around 5:30PM. Although she gives her sons and husband chores to do while she rests, she would frequently have to complete them herself to ensure they were properly completed. She

reported her ability to feed her animals, with some assistance from her husband and sons. The claimant noted that she struggles with her ability to bend, lift, reach, squat, stand, walk, and sleep. She also wrote that she no longer attends sports functions, church, or other social affairs. The claimant could pay bills, count change, handle a savings account, and use a checkbook/money orders. (R. 220-28).

On February 25, 2010, the claimant visited Dr. Deichmann, her primary care physician who worked at Craddock Health Center, P.C., complaining of headaches and nausea, as well as chronic neck and back pain. Dr. Deichmann prescribed Fioricet for pain and Phenergan for nausea. (R. 325).

On March 24, 2010, the claimant returned to Dr. Hamo. The claimant informed Dr. Hamo that she was unable to continue physical therapy because of the pain it caused and its ineffectiveness. She complained that while the pain remained the same, it now triggered headaches and sleep problems. He refilled her medications, and prescribed Neurontin 300mg for fibromyalgia. The claimant again refused previously discussed injections. (R. 331).

On April 22, 2010, Denise Poole, of the Disability Determination Service, completed a physical residual functional capacity assessment. She found that the claimant could occasionally lift a maximum of twenty pounds, frequently lift a maximum of ten pounds, could stand and/or walk for a total of about six hours in an eight-hour work day, could sit for about six hours in an eight-hour work day, and had the ability to push and/or pull. Ms. Poole found that the claimant could occasionally climb, stoop, kneel, crouch, and crawl; could never balance; had unlimited ability to reach in all directions and feel; had limited gross manipulation and fine manipulation ability; had no visual or communicative limitations; should avoid concentrated exposure to

extreme cold, heat, wetness, humidity, noise, vibration, and fumes/poor ventilation; and should avoid all exposure to hazards. (R. 338-45).

On May 24, 2010, the claimant complained of neck pain, low back pain, neck-related headaches, and occipital neuralgia with sharp pain in the right occipital area. Dr. Hamo increased her daily dosage of Neurontin to 300mg twice a day. He continued all her other prescriptions, treatments, and restrictions. She continued to refuse previously discussed injections. (R. 417).

On June 4, 2010, Dr. Hamo completed a physical capacities evaluation at the request of the Disability Determination Service. Dr. Hamo concluded that the claimant could occasionally lift a maximum of twenty pounds; could sit for greater than seven hours in an eight-hour work day; could stand for less than one hour in an eight-hour work day; does not require an assistive device; and should avoid extremes of temperature, humidity, and other environmental pollutants. He also found that she could occasionally engage in fine manipulation; should rarely use her arm and/or leg controls, climbing and balancing, gross manipulation, bend and/or stoop, and operate a motor vehicle; and never work with or around hazardous machinery. Dr. Hamo expected the claimant to miss more than four days per month because of her impairments or treatment. In addition, Dr. Hamo found that the claimant's pain was to such an extent as to distract her from adequate performance of daily activities or work; that physical activity greatly increased pain to such a degree as to cause distraction or total abandonment from task; and that drug side effects can be expected to be severe and to limit effectiveness because of distraction, inattention, and drowsiness. (R. 368-69).

Between July 12 and 15, 2010, three different physicians treated the claimant for abdominal pain. The claimant suffered from uterine fibroids and a urinary tract infection. On July

23, 2010, Dr. Blaudeau performed a laparoscopic hysterectomy. (R. 374-401).

On September 1, 2010, the claimant described worsening pain in her low back since her hysterectomy, with increased pain distribution down the right lower extremity. Dr. Hamo changed the claimant's prescriptions, increasing her daily dosage of Neurontin to 300 mg three times a day, her daily dose of Robaxin 750mg to three times a day, and her Lortab 7.5 to Lortab 10. (R. 416).

On November 11, 2010, the claimant complained of worsening neck and low back pain, as well as sharp pain in the right occipital area with her headaches. On December 1, 2010, the claimant returned to Dr. Hamo's office, complaining of left side pain associated with her headaches, dizziness, and blurred vision in both eyes. Dr. Hamo decreased Neurontin to 300mg at bed time, and maintained all other prescriptions and restrictions. He ordered an MRI of the claimant's brain and carotid doppler for further evaluation of her headaches, dizziness, and vision changes. The MRI revealed mild cerebellar tonsillar ectopica (Chiari I malformation) and minimal mucosal thickening of the ethmoid sinus. The carotid doppler revealed no abnormalities. (R. 405-08).

On January 17, 2011, the claimant informed Dr. Hamo that she needed to use more than one Lortab 7.5 per day because of the increased neck and low back pain, flare up of arthritic symptoms, and tendinitis of her upper and lower extremities. Dr. Hamo ordered a psychiatric evaluation and blood work evaluation. The claimant again refused previously discussed injections for fear of gaining weight. (R. 410).

On May 6, 2011, Dr. Hamo adjusted the claimant's medication, replacing Robaxin with Zanaflex 4mg for severe neck pain, neck-related headaches, and low back pain three times a day.

He refilled her other prescriptions. The claimant continued to refuse previously discussed injections. (R. 419).

Throughout June and July 2011, the claimant visited Dr. Gordon T. Connor, a primary care physician who worked at Childersburg Primary Care. During both visits, Dr. Connor did not report any depression or signs of depression in the claimant. (*See* R. 421-29).

On August 8, 2011, the claimant visited Dr. Hamo complaining of lumbosacral radiculopathy, neck-related headache, low back pain, neck pain. She asked for Dr. Hamo to prescribe Robaxin, as Zanoflex made her nauseous. As a result, he switched her back to Robaxin 750mg, four times a day, and maintained all other prescriptions, treatments, and restrictions. (R. 450).

*Mental Limitations*

On April 16, 2010, Dr. Robert Kline, a psychologist specializing in child, adolescent, and adult evaluations, performed a mental evaluation of the claimant at the request of the Disability Determination Service. He noted that she did not suffer from any side effects from the medication, that she had some sensory and memory problems, and that she had an estimated IQ that fell below the borderline MR range. However, Dr. Kline found no psychiatric diagnosis, and placed her GAF at 79. He believed that, if the claimant could physically perform the work, she had the capacity to understand; to carry out and remember instructions; and to respond appropriately to supervision, co-workers, and work pressure. (R. 336-37).

On April 27, 2010, Dr. Samuel D. Williams, a consulting psychiatrist, completed a psychiatric review technique (PRT) at the request of the Disability Determination Service. His findings revealed non-severe depression. However, Dr. Williams noted that while the claimant's

12

medical diagnosis "could reasonably be expected to produce some of the above stated symptoms and functional limitations[, h]er statements about her symptoms and functional imitations are only partially credible, as the severity alleged is not consistent with the objective [medical findings]." Dr. Williams indicated that the evidence did not support the severity of the alleged symptoms, and that the claimant's alleged  functional limitations were inconsistent with her daily activities. (R. 346-58).

*The ALJ Hearing*

On April 28, 2010, the Commissioner determined that the claimant was not disabled and denied the claimant's application for disability insurance benefits and supplemental security income. (R. 92-101). The claimant timely filed a written request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on October 5, 2011. (R. 12).

At the hearing, the claimant alleged that she suffered from several impairments arising from the two motor vehicle accidents occurring on May 23, 2009 and September 12, 2009. The claimant testified that continuous low back and neck pain prevented her from standing for long periods of time, and that sitting or standing for longer than ten minutes caused her pain, that radiated from her lower back to her left lower extremity. The CTS in her wrists caused numbness, weakness, and irritability. The claimant testified that the pain in her neck and back had gotten worse since her second car accident. The claimant also testified that she could control her headaches with medication. (R. 49-59, 62, 67-68).

The claimant described her family life: she lives in a mobile home with her husband and three children, ages eighteen, sixteen, and seven. She helps her family cook meals, clean the house, shop for groceries, and do the laundry. She spends most of her time, however, watching

television. The claimant testified that she visited her family and attended meetings, church, and social events. The claimant testified that she drove her car roughly three times per week. She also testified that she still struggled to sleep at night.  (R. 62-65, 67-68).

Next, the claimant described Dr. Hamo. The claimant testified that Dr. Hamo acted as her treating physician following her first motor vehicle accident. She testified that Dr. Hamo suggested neck exercises, using the TENS unit, and wearing splints to alleviate the pain in her neck, low back, and CTS. (R. 60-62).

The ALJ asked the claimant to go through her typical day. She testified that she would wake up at 6:00AM to wake up her sixteen- and seven-year-old sons to catch the bus by 7:00AM. She then would try to eat breakfast, take her medication, and turn on the TENS machine while watching television. Because she would frequently find herself awake during the night, trying to iron and clean her youngest son's clothes, she would doze while watching television. When she would wake up, she would clean the house. She would collect all the laundry from the various bedrooms and bathrooms. She would frequently talk on the phone with her sister, who would also bring the home's supply of water. When her sister delivered the water, she would bring the two one-gallon jugs into the kitchen. Sometimes she would run errands with her sister, but she would arrive back home in time for the school bus at 3:35PM. She would then lay in bed for an hour or so, before helping her sons with their homework and getting ready for bed. (R. 69-72).

Dr. David Head, a vocational expert with a PhD. in rehabilitation counseling, then testified as to the ability of the claimant to work in the future. Dr. Head characterized the claimant's prior work as an unskilled position with medium exertion (cleaner) and unskilled position with light exertion (fast-food employee, inspector, breakfast host, and cashier). None of

these jobs provided the claimant with transferable skills. (R. 75-77).

The ALJ then hypothesized a younger individual who has a high school education, who could perform light work, except with the following limitations: only occasional bending; no upper extremity pushing or pulling; no left upper extremity overhead reaching; no driving; no unprotected heights; no lower extremity pushing or pulling; and borderline IQ. Dr. Head testified that he did not believe any light-exertion work opportunities existed that the claimant could perform, because of her inability to bend. He then testified that sedentary work opportunities existed that the claimant could perform with these limitations, including non-complex clerical jobs, with 1,700 jobs available in Alabama and 63,000 in the country; and surveillance systems monitor with 3,200 available jobs in Alabama and 220,000 in the country. The ALJ then asked whether Dr. Head believed, given the previously described limitations, that the claimant would be able to return to any of her previous work. Dr. Head noted that because of the inability to bend, she would not be able to perform any of the pervious jobs. (R. 77-79).

The ALJ then posed a second hypothetical with the same limitations as the first. The only difference was that the hypothetical woman could not longer move her neck, except to occasionally move it from left to right or up and down. Dr. Head stated that this hypothetical woman would be unable to perform the sedentary jobs previously described. The ALJ then posed a third hypothetical with the restriction that the woman would need to be able to sit and stand at her own option. Dr. Head testified that this limitation would not preclude this woman from work at the sedentary jobs previously discussed, but it may eliminate roughly one-fourth of the available positions. (R. 79-80).

The ALJ questioned Dr. Head about the ability to work in these sedentary positions while

experiencing pain. Dr. Head found that if the claimant's level of pain is moderately severe to severe, then such a pain level would prevent her from performing the previously discussed sedentary work. Dr. Head further concluded that moderately severe to severe levels of pain would prevent the claimant from being able to concentrate and keep up with the heavy requisite pace and persistence the positions would require. He then testified that a non-complex clerical or surveillance systems monitor position would only permit a maximum of twenty absences a year, or two per month for an extended period of time. Finally, Dr. Head concluded that these positions would not permit the claimant to lay down whenever she chose during regularly scheduled work hours. (R. 80-82).

Dr. Head then testified that if the claimant's physical capabilities evaluation was credible, she could not work in any exertion level of work on a full-time basis. He based this conclusion on several factors. First, her inability to stand for longer than one hour in an eight-hour work day would limit the jobs available. Second, her ability to use gross manipulations rarely and fine manipulation no more than occasionally would permit the use of her hands for only one-third of the work day. The ability to only occasionally engage in fine manipulation would prevent her from performing the previously discussed jobs. Third, missing more than four days a month would prohibit sustained employment. (R. 82-84).

Finally, Dr. Head testified that if the claimant could not work forty-hour work weeks, or could not work all five days, then she would be unable to perform the sedentary jobs. He further stated that intermittent moderately severe to severe pain would prevent the claimant from sustaining competitive employment. He concluded by testifying that moderately severe to severe side effects from medication would also prohibit the claimant from sustaining competitive

16

employment.

*The ALJ's Decision*

On October 21, 2011, the ALJ issued a decision finding that the claimant was not

disabled under the Social Security Act. (R. 27). First, the ALJ found that the claimant met the

insured status requirement of the Social Security Act through December 31, 2013. Second,

although the ALJ found that the claimant worked after the alleged disability onset date, he held

that the claimant's earnings did not rise to the level of substantial gainful activity. The ALJ found

that the claimant had several severe impairments: "fibromyalgia, chronic neck and low back pain,

headache, and carpal tunnel syndrome." The ALJ found that these severe impairments

significantly limited the claimant's ability to perform basic work activities. However, he

determined that the claimant did not have a severe mental impairment. (R. 15-20).

In discrediting the claimant's testimony regarding her subjective pain and other

symptoms, the ALJ applied the pain standard. The ALJ discussed at length the claimant's

testimony on her inability to stand for long periods of time, the pain physical activity caused, and

her weakness in her hands. However, then the ALJ examined her daily routine to determine the

credibility of her symptoms . The claimant cooked, cleaned, shopped for groceries, and did

laundry with assistance from her husband and sons. She drove about three times a week to her

mother's house, church, and social activities. Because of a water problem in her home, the

claimant's sister delivered two one-gallon jugs of water to her front door, which the claimant

would then take into her kitchen. As a result of these daily activities, the ALJ held that the

medically determinable impairments could reasonably be expected to cause some symptoms, but

"the intensity, persistence, and limiting effects of these symptoms are not completely credible to

the extent they are inconsistent with the [later discussed] residual functional capacity assessment." (R. 20-23).

In finding the extent of the claimant's alleged symptoms not credible, the ALJ examined the clinical notes from various doctor, and he found that her most of her treating physicians failed to note any disabling pain or limitations. The ALJ noted that Dr. Connor, who treated the claimant in June and July of 2011, did not report any disabling pain or limitations, nor any significant medical side effects. In fact, Dr. Connor reported "that she was in no distress." The ALJ also indicated that Dr. Francavilla and Dr. Kraus similarly did not note that the claimant had disabling pain or limitations. In fact, the ALJ reported that Dr. Francavilla had noted that the claimant's physical therapy was efficacious prior to her second motor vehicle accident, and that "she [had been] pain free before she was involved in another motor vehicle accident in September 2009." (R. 23).

The ALJ discussed that only Dr. Hamo found that the claimant experienced disabling pain and limitations: Dr. Hamo. The ALJ noted that Dr. Hamo reported that the claimant suffered from "disabling pain and . . . limitations[,] and would be likely to be absent from work more than four days per month as a result of her impairments or treatment." The ALJ also noted that despite informing Dr. Hamo that she experienced side effects, the claimant did not indicate any limitations in her daily activities. The ALJ did not assign Dr. Hamo's June 2010 opinions significant weight because he found that the claimant's own function report showed inconsistencies. The claimant reported that she could do laundry, wash dishes, vacuum, prepare meals daily, pay bills, count change, handle a savings account, and use a checkbook and money orders. The claimant also indicated in her function report that "she went outside three times a

week and walked, drove a car, or rode in a car. She reported that she shopped as needed, and she reported that she was able to pay bills, count change, handle a savings account, and use a checkbook/money orders." The ALJ concluded that Dr. Hamo's medical opinions were not "consistent with the record as a whole, including the claimant's daily activities." (R. 23-24).

In addition to the pain and limitations, the ALJ discussed that Dr. Hano treated the claimant for depression and anxiety. However, the ALJ noted the claimant did not report or testify as to any mental impairment. In addition, the ALJ found that neither Dr. Connor, Dr. Deichmann, Dr. Francavilla, nor Dr. Kraus reported that the claimant suffered from depression or any other mental impairment. In addition, the ALJ found that Dr. Kline made no psychiatric diagnosis, concluded her GAF to be 79, and reported no memory or concentration problems. The ALJ also noted that Dr. Kline found that her primary restrictions appeared physical. Ultimately, the ALJ found that the claimant's daily activities were inconsistent with moderately severe to severe pain, and conflicted with Dr. Hamo's clinical notes that she could not perform work on a sustained forty hour per week basis. (R. 24-25).

Despite finding these physical impairments, the ALJ concluded that the claimant had the RFC to perform sedentary work with limitations: occasional bending; no upper extremity pushing or pulling; no left extremity overhead reaching; no driving; no unprotected heights; no lower extremity pushing or pulling; and borderline IQ. (R. 20-21).

After determining that the claimant had the residual functional capacity to perform sedentary work, the ALJ concluded that she would not be able to perform any of her previous work. Because her previous work involved light to medium exertion, and the claimant could no longer perform any level of exertion, the ALJ concluded that she could not perform her past

19

relevant work. (R. 25).

Given the claimant's age, education, work experience, and residual functional capacity, the ALJ found that jobs existed in significant numbers in the national economy that she could perform. The ALJ noted that Dr. Head testified the claimant could perform the jobs of non-complex clerk and surveillance systems monitor. Although not discussed by Dr. Head, the ALJ also noted the availability of telephone order salespersons, of which 3,200 of such jobs exist in Alabama and 220,000 exist in the nation. The ALJ finally concluded by finding that given the claimant's age, education, work experience, and RFC, the claimant could make a successful adjustment to other work that exists in significant numbers in the national economy. The ALJ therefore concluded that the claimant was not disabled. (R. 26-27).

## VI. DISCUSSION

The claimant argues that the ALJ erred in disregarding the claimant's pain and other symptoms, and in not attaching significant weight to Dr. Hamo's medical opinions. This court disagrees.

While this court reviews *de novo* "the legal principles upon which the Commissioner's decision is based, the court's role in reviewing the ALJ's factual determinations is a limited one." *Moore*, 405 F.3d at 1211 (citing *Chester v. Bowen* 729 F.2d 129, 131 (11th Cir. 1986)). The court may not re-adjudicate the case, reweighing facts and evidence and substituting its judgment for that of the Secretary. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). This deference requires that, even if evidence preponderates against the Secretary's decision, the court must still affirm the decision if supported by substantial evidence. *Id*.

*1. The ALJ Properly Considered the Claimant's Complaints of Pain and Other Symptoms*

The court finds that the ALJ properly applied the pain standard and that substantial evidence supports his findings. In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* (1) objective medical evidence confirms the severity of the alleged pain arising from that condition *or* (2) that the severity of the objectively determined medical condition can reasonably be expected to give rise to the alleged pain. *Holt*, 921 F.2d at 1223; 20 C.F.R. § 404.1529. The ALJ may consider the claimant's daily activities when determining the validity of the complaints of disabling pain. *Harwell*, 735 F.2d at 1293.

The ALJ must articulate reasons for discrediting the claimant's subjective testimony. If the ALJ does not explicitly articulate reasons for disregarding the claimant's subjective testimony of pain, the court must accept it as true. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). A reviewing court will not disturb a clearly articulated credibility finding supported by substantial evidence. *Foote*, 67 F.3d at 1562.

In applying the standard from *Holt*, the ALJ concluded that although "the claimant's medically determinable impairments could reasonably be expected to cause some symptoms[,] . . . the claimant's statements concerning the intensity, persistence, and the limiting effects of these symptoms are not completely credible to the extent they are inconsistent" with his residual functional capacity assessment. (R. 23). The ALJ utilized the pain standard in determining the credibility of the claimant's complaints of pain.

First, the ALJ examined the evidence demonstrating an underlying medical condition causing the claimant's medical condition. The ALJ had already determined that the claimant suffered from "the 'severe' impairments of fibromyalgia, chronic neck and low back pain,

21

headache, and [CTS]." (R. 19).

Second, the ALJ found that objective medical evidence did not confirm the severity of the alleged pain and limitations. The claimant testified that she experienced pain and weakness in her left arm, that back pain radiated down her lower extremities, and that her pain had gotten worse. (R. 21). However, the ALJ correctly noted that her treating physicians never noted any disabling pain or limitations. No doctor, other than Dr. Hamo, reported that the claimant experienced disabling pain from her severe impairments. The ALJ notes that "[t]he diagnostic studies do not support the claimant's alleged degree of limitations, nor the intensity, frequency, and severity of the signs and symptoms alleged by the claimant." (R. 25).

In addition, the ALJ considered her side effects of her medication in determining the severity of the alleged pain and limitations. The ALJ noted that Dr. Hamo's reported in June 2010 that the side effects from the claimant's medications amounted to a disabling limitation, as they "c[ould] be expected to be severe and to limit effectiveness because of distraction, inattention, and drowsiness." (R. 369). Moreover, the ALJ correctly determined that any time the claimant complained of side effects from the medications, Dr. Hamo adjusted them accordingly. Because she did not indicate that her daily activities were limited because of the side effects, the ALJ properly *considered* her side effects, but permissibly afforded little, if any, weight to them.

Third, the ALJ concluded that the claimant's impairments could not be of such severity to reasonably be expected to give rise to the alleged pain. The ALJ examined the daily activities to which the claimant testified. While the claimant testified as to the amount of pain and weakness she experienced as a result of her impairments, she also testified that she frequently cooked, cleaned, grocery shopped, and did laundry with some assistance from her family. In addition, she

testified that she frequently visited her mother, attended social gatherings, and attended church. Finally, she testified that because of a water issue, she would bring two one-gallon jugs of water from her front door to her kitchen. The ALJ properly concluded that "her daily activities are not consistent with disabling pain or limitations." (R. 24).

This court finds that the ALJ explicitly articulated his reasons for discrediting the claimant's testimony regarding her pain, and that substantial evidence supports his decision.

### 2. The ALJ Property Weighed the Opinion of the Claimant's Treating Physician, Dr. Hamo

The Commissioner must accord the opinions of the treating physician with substantial or considerable weight, and unless recounting *good cause* to the contrary, the Commissioner cannot discount the treating physician's opinions. *Lamb v. Brown*, 847 F.2d 698, 703 (11th Cir. 1998). Good cause exists if the physician's opinion is not supported by evidence; the evidence supports a contrary finding; the physician's opinion is conclusory; or the physician's opinion is inconsistent with the doctor's own medical records. *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004); 20 C.F.R. § 416.927. Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight and those reasons are supported by substantial evidence, the ALJ commits no reversible error. *Moore*, 405 F.3d at 1212.

The ALJ explictly rejected Dr. Hamo's medical opinion because it conflicted with the totality of the record. He utilized other physician's medical opinions,f as well as the claimant's own testimony as evidence for not affording "significant weight" to Dr. Hamo's medical opinions.

First, the ALJ found that several physicians treated the claimant following her second accident on September 12, 2009. The ALJ noted that Drs. Connor, Deichmann, Francaville, and

23

Klaus did not report any disabling pain or limitations. The ALJ found that only Dr. Hamo believed and reported that the claimant suffered from disabling pain and limitations. In addition, the ALJ discussed that only Dr. Hamo noted that the claimant suffered from disabling depression. The ALJ examined Dr. Williams's consultation of the claimant, in which Dr. Williams noted that the claimant might suffer from non-severe depression. (R. 346). The ALJ also discussed Dr. Kline's clinical notes that reported no evidence of depression. (R. 25). The ALJ articulated that none of the claimant's other treating physicians reported any signs of depression. The ALJ concluded that only Dr. Hamo found that the claimant suffered from disabling depression. The ALJ properly found that Dr. Hamo's medical opinions departed from those of the other physicians.

Second, the ALJ discussed how the claimant's testimony provided evidence questioning Dr. Hamo's medical opinion. The ALJ properly noted that the claimant's daily routine included light to moderate exertion on a daily basis. The ALJ found that the claimant would cook, clean, do laundry, go shopping, socialize, drive, and carry objects. The ALJ noted that Dr. Hamo's physical capabilities evaluation reported that the claimant could not engage in any kind of exertion without severe pain. However, the ALJ properly concluded that the claimant's daily routine frequently, if not always, involved some level of exertion. Moreover, the ALJ noted that Dr. Hamo's physical capabilities evaluation reported that the claimant had severe side effects from her medication. However, while the claimant testified that "some of her medications made her sick," the ALJ found that the claimant did not indicate that this limited her daily activities. (R. 23). Finally, despite Dr. Hamo's report that the claimant suffered from disabling depression, the ALJ properly found that the claimant did not testify as to that fact.

Because the evidence provided by other physicians as well as the claimant's own testimony did not support the medical opinion of Dr. Hamo, the ALJ had good cause not to afford it substantial weight. This court finds that the ALJ applied the proper legal standard in discounting Dr. Hamo's medical opinion, and substantial evidence supports the ALJ's decision.

## VII. CONCLUSION

For the reasons as stated, this court concludes that substantial evidence does support the decision of the Commissioner, and is consequently to be AFFIRMED consistent with this opinion.  The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 22nd day of May, 2014.


KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE

25